1

2

3

4

5

6

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Sean L. Litteral (State Bar No. 331985)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
          jsmith@bursor.com
          slitteral@bursor.com

7

*Attorneys for Plaintiff*

8

9

10

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

11

12

13

14

15

16

17

18

VANESSA GONZALEZ, individually and on
behalf of all others similarly situated,

                                                  Plaintiff,

          v.

PERFORMIX LLC,

                                                  Defendant.

Case No.  1:21-cv-01271-AWI-HBK

**FIRST AMENDED CLASS ACTION
COMPLAINT**

<u>JURY TRIAL DEMANDED</u>

19

20

21

22

23

24

25

26

27

28

---

First Amended Class Action Complaint – Jury Trial Demanded

Plaintiff Vanessa Gonzalez ("Plaintiff"), individually and on behalf of all other similarly situated purchasers (hereafter the "Class"), brings this consumer class action against Performix LLC ("Defendant") for the distribution, advertisement, and sale of dietary supplement capsules sold as SST Timed Release Metabolism and all other substantially similar products, including SST V3X (the "Products") and alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and members of the proposed class are citizens of states different from Defendant.  This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

2.      Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because Plaintiff is a citizen of California and resides in this District, and because Plaintiff purchased her Product in this District.  Moreover, Defendant distributed, advertised, and sold the Product, which is the subject of the present complaint, in this District.

## THE PARTIES

3.      Plaintiff Vanessa Gonzalez is an individual domiciled in Modesto, California.  In January 2020, Plaintiff Gonzalez purchased SST Timed Release Metabolism from a GNC Store located in Modesto, California.  She purchased these capsules for herself.  In doing so, Plaintiff Gonzalez relied upon Defendant's advertising, packaging, labeling and other promotional materials, which were jointly prepared and approved by Defendant and its agents and disseminated through advertising media containing the misrepresentations, concealments and unlawful claims alleged herein.  Specifically, Plaintiff Gonzalez understood and appreciated that the key ingredients contained in the Product, including Defendant's use of caffeine and Capsimax would help her lose weight.  These outcomes were Plaintiff Gonzalez's chief reason for purchasing the Product as she specifically set out to find such products.

4.      The prominent use of the phrases, "Energy," "Metabolism," and "Focus" led Plaintiff to pick up the Product for further education.  After reading that caffeine and Capsimax

would lead to her desired therapeutic outcomes of losing weight, and finding no contradictory information in the areas where these outcomes were disclosed, Plaintiff Gonzalez added this Product to her shopping cart.

5.      Plaintiff Gonzalez would not have purchased the Product if she had known the truth about the Product, namely that the ingredients would not lead to her desired therapeutic outcomes of losing weight.  Moreover, Plaintiff Gonzalez would not have purchased the Product if she had known in advance that these claims had not been evaluated by the Food and Drug Administration (the "FDA").  Plaintiff Gonzalez believes that the prominent use of such a statement would have aided her in her purchase by calling into question the efficacy of the ingredients, allowing her to make an informed choice as a reasonable consumer.  Plaintiff Gonzalez would not have purchased the Product if she had known that Defendant's statements had not, in fact, been evaluated by the FDA and that they were otherwise unlawful to sell under California law.

6.      Defendant Performix LLC is a Colorado company with its principal place of business in New York, New York.  At times relevant to this Complaint, Defendant has advertised, marketed, and sold a variety of cosmetic products, including that at issue, to consumers throughout the United States and the State of California.  Defendant has sold the Product directly to consumers via the Internet and through third-party retail stores throughout the United States, including in this District.

## FACTUAL ALLEGATIONS

### A.      The Market For Dietary Supplements Is Rapidly Expanding, Necessitating the Use of Relevant Laws to Protect Consumers From Products Like Those Produced By Defendant

7.      In 2020, the dietary supplements market in the U.S. was estimated at $46 Billion, and the global market for dietary supplements is expected to grow to $298.5 Billion by 2027.[1]

8.      For decades, consumers have been prioritizing their health and wellness through the use of dietary supplements.  That interest took on even greater resonance when the COVID-19

---

[1]      https://www.businesswire.com/news/home/20210219005385/en/Global-Dietary-Supplements-Market-Report-2020-Market-to-Reach-298.5-Billion-by-2027---U.S.-Market-is-Estimated-at-46-Billion-While-China-is-Forecast-to-Grow-at-12.7-CAGR---ResearchAndMarkets.com.

pandemic struck last year, with millions of American consumers seeking out ways to stay healthy and boost their immunity.

9.      This has happened at the same time as obesity rates in the U.S. have skyrocketed. According to a new study, the COVID-19 pandemic "changed eating habits, worsened levels of food security, created obstacles to physical activity, and heightened stress."[2]  Since the pandemic began, 42% of adults in the U.S. reported gaining an undesired amount of weight, according to a Harris Poll conducted in February 2021.  U.S. adults reported gaining an average of 29 pounds. Those who struggle with obesity—having a body mass index of 30 or higher—are at greater risk for a range of diseases, including heart disease and stroke, two of the leading causes of death in the United States, according to the Centers for Disease Control and Prevention.  Moreover, those who struggle with obesity are at greater risk of coronavirus infection, hospitalization, and death.[3]

10.      Motivated, in part, by the desire to lose weight, U.S. consumers' purchases of vitamins and supplements has increased significantly.  IRI calculates that vitamin, mineral and supplement sales have risen 21% since the pandemic began, with market shares of certain types of vitamins and supplements increasing exponentially.[4]

11.      Larry Levin, executive vice president of consumer and shopper marketing at IRI states that: "Prior to COVID-19, 80% of consumers were using vitamins, minerals and supplements as part of their ritual anyway, but I think the pandemic just strengthened their commitment to the product category."[5]

12.      IRI data shows that buying vitamins and supplements has been at the forefront of consumers' minds since the early days of the pandemic, with 35% of households buying vitamins

---

[2] Kaia Hubbard, "The Pandemic Has Worsened the U.S. Obesity Epidemic," *U.S. New & World Reports* (Sept. 15, 2021), https://www.usnews.com/news/best-states/articles/2021-09-15/the-pandemic-has-worsened-americas-obesity-epidemic-report-finds (last accessed Dec. 7, 2021) (quoting Trust for America's Health, "State of Obesity 2021: Better Policies for a Healthier America," (Sept. 2021), https://www.tfah.org/wp-content/uploads/2021/09/2021ObesityReport_Fnl.pdf).
[3] *Id.*
[4] Emily Crowe, "Behind the growth in the dietary supplement, vitamin market," *Smart Brief* (Mar. 3, 2021), https://www.smartbrief.com/original/2021/03/behind-growth-dietary supplement-vitamin-market (last accessed Dec. 7, 2021).
[5] *Id.*

in the four weeks ending April 5, 2020.[6]   The momentum has continued, with 40.6 million households purchasing vitamins in January 2021, compared to 35.5 million the prior year. According to Mr. Levin, "When you think about the impact that category has on our lifestyle, it's really profound."[7]

13.    The COVID-19 pandemic has demonstrated more than ever that consumers will seek to support their health through dietary supplements and, in making those critical purchasing decisions, must be able to trust that labels and claims for dietary supplements are truthful, substantiated, and meet all legal requirements to be lawfully sold over the counter.   However, according to FDA spokesperson, Courtney Rhodes, "[t]he FDA currently has no systematic way of knowing what dietary supplements are on the market, when new products are introduced, or what they contain."[8]

14.    This problem is exacerbated by the fact that when the relevant laws were passed, "the supplement market was worth about $5 billion.  Now it's roughly $50 billion."  That is, the market grew ten-fold, but "the FDA budget did not increase by 10 times."  As a result, supplement companies like Defendant are able to use this vacuum in enforcement to their advantage, marketing their products as diagnosing, treating, or curing diseases without any evidence regarding their efficacy and without prior approval by the FDA, thus violating federal statutes and regulations and Article III Courts' jurisprudence in this area.

15.    In turn, consumers like Plaintiff, who sought out weight loss products were led to believe that Defendant's Product had qualities that they did not have.  Worse, Defendant advertises its products as cutting fat and improving metabolism, despite the fact that the United States General Accounting Office (the "GAO") has determined that "[i]n summary, little is known about whether weight loss supplements are effective."[9]   That is, "[a]lthough there have been studies on specific

---

[6] *Id.*

[7] *Id.*

[8] Christie Aschwanden, "Prohibited, unlisted, even dangerous ingredients turn up in dietary supplements," *The Washington Post* (June 30, 2021), https://www.washingtonpost.com/health/contaminated-supplements-unexpected-ingredients/2021/06/25/5d22227ec-bd62-11eb-83e3-0ca705a96ba4_story.html (last accessed Dec. 7, 2021).

[9] Janet Heinrich, "Dietary Supplements for Weight Loss," United States General Accounting Office (July 21, 2002), https://www.gao.gov/assets/gao-02-985t.pdf (last visited Dec. 7, 2021).

ingredients, many of these studies have been short of duration, involved small numbers of individuals, or used study approaches that limited the usefulness of their findings."  And while some studies may support claims in the short-term, "[t]here have been few comprehensive reviews or long-term studies of efficacy.  One comprehensive review of alternative treatments for weight loss found no reliable scientific evidence for any of the weight loss supplement that it reviewed."[10]

**B.**   **The Labeling Requirements For Dietary Supplements**

**1.**   **An Overview Of The Statutory And Regulatory Scheme And Associated Jurisprudence**

16.   The Federal Food, Drug, and Cosmetic Act of 1938, 21 U.S.C. § 301 *et seq*. (the "FFDCA" or the "Act"), as amended by the Dietary Supplement Health and Education Act of 1994, Pub. L. No. 103–417, 108 Stat. 4325 ("DSHEA"), as well as the regulations implementing the FFDCA and DSHEA set forth the legal requirements for labelling and selling dietary supplements.

17.   These requirements are fully incorporated into California's Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 109875 *et seq*. ("Sherman Law").  The Sherman Law is explicitly authorized by the FFDCA, 21 U.S.C. § 343-1.  The Sherman Law imposed identical requirements to the FFDCA, including the FFDCA's food labeling requirements.  *See* Cal. Health & Safety Code § 110110.

18.   In 1906 Congress enacted the FFDCA's predecessor, the Pure Food and Drugs Act of 1906.  *See 62 Cases More or Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 594, 71 S. Ct. 515, 517, 95 L. Ed. 566 (1951) (outlining the history of the FFDCA).  "By the Act of 1906, 34 Stat. 768, as successively strengthened [by the FFDCA], Congress exerted its power to keep impure and adulterated foods and drugs out of the channels of commerce."  *Id.* at 596.  "The purpose of this legislation, we have said, 'touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection.  Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words."  *Id.* (quoting *United*

---

[10] *Id.* at 6.

*States v. Dotterweich*, 320 U.S. 277, 280, 64 S. Ct. 134, 136, 88 L.Ed. 48).   Specifically, "[m]isbranding was one of the chief evils Congress sought to stop." *Id.*   That is, "[t]he purpose of the act [was] to secure the purity of food and drugs, and to inform purchasers of what they are buying.   Its provisions are directed to the purpose and must be construed to effect it." *United States v. Antikamnia Chem. Co.*, 231 U.S. 654, 665, 34 S. Ct. 222, 225, 58 L.Ed. 419 (1914).

19.   For well over 100 years since the Pure Food and Drugs Act was initially enacted, both Congress and Article III Courts have demonstrated concern with the information conveyed on the packaging of foods and drugs whether or not they are harmful to health.   *See United States v. Bodine Produce Co.*, 206 F. Supp. 201, 208 (D. Ariz. 1962) ("In a long line of cases, the courts have held food [and drugs] may be adulterated regardless of whether they are injurious to health.") (citing *A.O. Andersen & Co. v. United States*, 9 Cir., 1922, 284 F. 542, 544; *United States v. Lexington Mill & Elevator Co.*, 1914, 232 U.S. 299, 410, 34 S. Ct. 337, 58 L.Ed. 658; *United States v. 716 Cases etc. Del Comida Brand Tomatoes*, 10 Cir., 1950 179 F.2d 175, 176; *United States v. 449 Cases etc. Tomato Paste*, 2 Cir., 1954, 212 F.2d 567, 570-572; and *United States v. Lazere*, D.C.N.D. Iowa 1944, 56 F. Supp. 730, 732).

20.   To this end, "the FFDCA must be 'given a liberal construction consistent with the Act's overriding purpose to protect the public health." *League of United Latin Am. Citizens v. Regan*, 996 F.3d 673, 691 (9th Cir. 2021) (citing *United States v. An Article of Drug . . . Bacto-Unidisk*, 394 U.S. 784, 798, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969)).

21.   Under the FFDCA, a "drug" is defined, in part, as an "article[] intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals" or an "article[] (other than food) intended to affect the structure or any function of the body of man or other animals."

22.   Under 21 U.S.C. §§ 331(d)[11] and 355(a),[12] the FDA must approve new drugs before they can be sold on the market.   Only then can a manufacturer make any claims that their product

_____

[11] 21 U.S.C. § 331(d) ("The following acts and the causing thereof are prohibited: . . . The introduction or delivery for introduction into interstate commerce of any article in violation of section . . . 355 . . . of this title.").
[12] 21 U.S.C. § 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval or application [is] filed[.]").

can treat, prevent, or cure a disease.  These claims are reserved for pharmaceutical products that have undergone years of extensive clinical, laboratory and safety studies.  These studies are costly and can take decades to complete.[13]  In light of these delays, the FFDCA creates an exemption from this pre-approval process for dietary supplements "intended to affect the structure or function of the body" if the dietary supplements carry a prominent FDA disclaimer on the product labels and advertising.

23.     Under these regulations, supplement companies like Defendant are prohibited from labeling, marketing, or selling dietary supplements bearing claims that "describe[] the role of a nutrient or dietary ingredient intended to affect the structure or function in humans, [or that] characterize[] the documented mechanism by which a nutrient or dietary ingredient acts to maintain such structure or function" (known as "structure/function claims"), unless the label carries a prominent disclaimer (the "DSHEA Disclaimer") on each panel bearing such claims.  *See* 21 U.S.C. §§ 321(g)(1), 331(d), 343(r)(1)(B), 343(r)(6), 355(a); 21 C.F.R. § 101.93(d) ("On product labels and in labeling (e.g., pamphlets, catalogs), the disclaimer shall appear on each panel or page where there [is a structure/function claim].").

24.     The DSHEA Disclaimer must be prominent and bolded, and it must read:

> **These statements have not been evaluated by the Food and Drug Administration.  This product is not intended to diagnose, treat, cure, or prevent any disease.**

21 U.S.C. § 343(r)(6)(C); *see also* 21 C.F.R. § 101.93(b)-(e).

25.     To be prominent, the disclaimer may not be crowded with non-required, or voluntary, information or imagery and additionally must be bolded font of *at least* 1/16th of an inch to size.

26.     As one Court recently explained, the DSHEA Disclaimer requirement is important for consumer safety:

> The disclaimer requirement aligns with the FDA's recognition that few dietary supplements have been the subjects of adequately

---

[13] Jamie Underwood, "These Statements Have Not Been Evaluated by the Food and Drug Administration," *Edible Chemistry Consulting* (June 7, 2019), https://edible-chemistry.com/news-notes/2019/6/7/these-statements-have-not-been-evaluated-by-the-food-and-drug-administration (last accessed Dec. 7, 2021).

designed clinical trials. Without the disclaimer, structure/function claims convey therapeutic drug claims, thereby encouraging self-treatment without the benefit of a medical diagnosis or treatment. The point of the disclaimers are to make sure that consumers understand that structure/function claims are not reviewed by [the] FDA prior to marketing, and to caution consumers that dietary supplements bearing such claims *are not for therapeutic uses*.

*Arora v. GNC Holdings, Inc.*, No. 19-cv-02414-LB, 2019 WL 6050750, at *3 (N.D. Cal. Nov. 15, 2019) (internal quotation marks and citations omitted) (emphasis in original).

27.     Dietary supplements that do not bear the required DSHEA Disclaimer on **all** panels with structure/function claims, and/or the disclaimer lacks the prominence required, are misbranded and unlawful.  21 U.S.C. § 343(r)(1)(B), (r)(6); 21 C.F.R. § 101.93(d).  The Food and Drug Administration has specifically rejected the proposition "that repetition of the disclaimer on every panel or page where a statement [is] made . . . is unnecessary."  62 Fed. Reg. 49859, 49864.  To meet statutory requirements, "***the disclaimer must be within the same field of vision as the statement itself***."  *Id.* at 49865 (emphasis added).

28.     Moreover, such products qualify as "drugs" under the FFDCA because they are marketed with structure/function claims but do not include the DSHEA Disclaimer.  *See* 21 U.S.C. §§321(g)(1), 343(r)(6).  To avoid being regulated as drugs under the FFDCA, dietary supplements bearing structure/function claims must comply with the DSHEA Disclaimer requirements.  *Id*.

29.     Misbranded dietary supplements and/or unapproved drugs are unlawful and cannot be sold legally under federal and identical California law.  21 U.S.C. §§ 331, 333.

30.     Because the products at issue here were illegal to sell, Plaintiff and class members are entitled to a full refund of the purchase price of their products.

**C.     Defendant's Unlawful Advertising, Sale and Labeling Of The Products**

31.     Unfortunately for consumers, Defendant Performix LLC continues to advertise, sell, and label its product in violation of the statutes referred to herein.

32.     In or around January 2020, Plaintiff purchased Defendant Performix LLC's vitamins.  However, as the photograph below demonstrates, Defendant's Products do not comply with the laws and regulations set out herein.

33.     The left-facing panel of Defendant's <u>SST Timed Release Metabolism</u> explicitly states under the heading "ENERGY AND METABOLISM," that ***"Performix SST is powered by Caffeine and Capsimax to accelerate your body's metabolism, provide sustained energy, and support fat breakdown."*** (emphasis added).   Defendant also mentions that ***"The inclusion of clinically-tested Capsimax, a naturally-derived, highly active concentrate of natural capsaicin which has been shown to increase resting energy expenditure by about 100 calories a day, allows Performix SST to accelerate your own body's metabolism to provide energy."*** (emphasis added). Defendant further mentions, under the heading "FOCUS," that ***"Performix SST is powered by Caffeine, Teacrine, and Sensoril to promote focus, clarity, concentration, and alertness."*** (emphasis added).  Each of these statements constitutes a structure/function claim.  However, none of these statements are accompanied by the requisite DSHEA Disclaimer on that panel.




34.     These issues extend to other of Defendant's Products such as its SST V3X. Although unpurchased by Plaintiff, Plaintiff has standing for these unpurchased Products under the doctrine of substantial similarity because (1) the products are physically similar; (2) the differences between the products are immaterial because the legal claim and injury to the consumer are the same; and (3) both the products and the legal claims and injury are similar.  *Yamasaki v. Zicam*

*LLC*, 2021 WL 4951435, at *2 (N.D. Cal. Oct. 25, 2021) (Gilliam, J.).

35.     Specifically, on the left-facing panel of SST V3X, Defendant claims that "PERFORMIX SST V3X is the hardest hitting, multi-phase timed-release thermogenic, delivering supercharged energy and intense mental focus along with enhanced fat metabolism." Defendant further states that "[t]he Suspension Super Thermo Complex in PERFORMIX SST V3X features TERRA Pod Ballistic Beadlets that are packed with powerful, hard-hitting ingredients including Caffeine, TeaCrine, Dynamite, and Yohimbine to stimulate thermogenesis, creating and supporting energy." Finally, Defendant claims that "PERFORMIX SST V3X promotes increased resting metabolic rate, thermogenesis and energy expenditure for ultimate fat burning and lean muscle development. This formula also provides Medium Chain Triglycerides for a fat-derived energy source, primed for absorption." Each of these claims constitutes a structure / function claim. However, none of these claims are accompanied by the requisite DSHEA Disclaimer on that panel.




36.     In both Products, the above-quoted statements have the capacity, likelihood, or tendency to confuse the public because none of the advertised ingredients, whether taken alone or together, cause weight loss or increase metabolism rates.

37.     Although Defendant lacks substantiation for its claims that Performix supports weight loss, that is not the basis for the claims alleged here.  Instead, the crux of this case is that—irrespective of Defendant's lack of substantiation—taking Performix does not cause weight loss, which is contrary to the product labeling and marketing.

38.     Further, although the Product packaging may contain a DSHEA disclosure in some other location on the packaging, the statement is not on the same side of the packaging as the statements at issue, and is not "within the same field of vision" as the statements.  62 Fed. Reg. 49859, 49865.  Any such disclaimer is not "prominent" because it would appear crowded among other nutrition labeling.  The FDA has warned that burying a disclaimer "under the nutrition label" does "not provide an acceptable alternative."  62 Fed. Reg. 49859, 49865.  Moreover, the entire packaging is peppered throughout with numerous different asterisks and symbols, which makes linking one asterisk with any disclosure a confusing process akin to playing a game of hide-and-seek.

39.     Accordingly, the differences between the Products are immaterial and the injury suffered by Plaintiff is the same as for consumers of SST V3X.

**D.     Plaintiff Suffered An Economic Injury**

40.     When purchasing the Product, Plaintiff read and relied on Defendant's labeling and marketing claims.  Like all reasonable consumers and members of the class, Plaintiff considered a label's compliance with federal law a material factor in her purchasing decisions.  Plaintiff is generally aware that the federal government carefully regulates packaged food products and dietary supplements and, therefore, has come to trust that the information conveyed on these types of product labels is truthful, accurate, complete, and fully in accordance and compliance with the law.  As a result, Plaintiff trusts that she can compare competing products on the basis of their labeling claims, to make purchasing decisions.

41.     Based on the Products' labeling, Plaintiff believed that the Product had the aforementioned characteristics and benefits, including that they were lawful.

42.     As a result, Plaintiff received a Product that lacked the characteristics and/or benefits that she reasonable believed the Product had.

43.     Plaintiff would not have purchased the above-described Product absent these sales, misrepresentations, and labeling and marketing practices.

44.     Plaintiff lost money as a result of Defendant's unlawful and deceptive and misleading conduct because Plaintiff did not receive the Product for which she believed she paid. Specifically, Plaintiff is entitled to a full refund because as a result of the labeling violations, the Product is misbranded and, therefore, were illegal to sell.

45.     By engaging in unlawful sales and/or deceptive and misleading marketing, Defendant reaped, and continues to reap, increased sales and profits, including with respect to its competitors.

46.     Defendant knows that the qualities and characteristics it labels and markets, as well as its omissions, are material to a consumer's decision to purchase the Product.

47.     Defendant deliberately cultivates these misperceptions through its marketing and labeling of the Product.  Indeed, Defendant relies and capitalizes on consumer misconceptions about its Product.

48.     Nonetheless, Plaintiff remains very much interested in purchasing Performix as she believes Defendant is a reputable company that has an interest in providing Products that are otherwise high in quality.

**E.     Defendant Changed Its Labeling After Plaintiff Filed Her Complaint**

49.     For Plaintiff to constitute a "successful party" under California Code of Civil Procedure § 1021.5, she must demonstrate that "(1) the lawsuit was a catalyst motivating the defendants to provide the primary relief sought; (2) that the lawsuit had merit and achieved its catalytic effect by threat of victory, not by dint of nuisance and threat of expense . . . and, (3) that the plaintiffs reasonably attempted to settle the litigation prior to filing the lawsuit." *MacDonald v. Ford Motor Co.*, 142 F. Supp. 3d 884, 890 (N.D. Cal. 2015).

50.     Importantly, California law has a "'broad, pragmatic view of what constitutes a successful party'" and "[t]o be a successful party, 'a favorable final judgment is not necessary.'" *Id.* at 891 (quoting *Ebbetts Pass Forest Watch v. California Dep't of Forestry & Fire Prot.*, 187 Cal. App.4th 376, 381, 114 Cal.Rptr.3d 351 (2010)).  Significantly, "the relief sought may be

1  obtained from 'a voluntary change in the defendant's conduct.'" *Id.* (quoting *Graham v.*
2  *DaimlerChrysler Corp.*, 34 Cal.4th 553, 567, 21 Cal.Rptr.3d 331, 101 P.3d 140 (2004)).

3      51.    Here, on July 16, 2021, Plaintiff issued a pre-suit demand for corrective action to
4  Defendant, notifying it of its violations of California law.

5      52.    It has recently come to Plaintiff's attention that Performix has quietly changed its
6  packaging in the wake of Plaintiff's pre-suit demand for corrective action and the filing of this
7  action.

8      53.    An image of Defendant's packaging as newly released is set out below:



20      54.    Defendant has since included the DSHEA disclaimer on the same panel as the
21  controverted claims.

22      55.    Similarly, Defendant also changed the packaging of its SST V3X.  Leading with the
23  header, "New Look," Defendant sets out the products side-by-side.  Noticeably, as discussed
24  above, the DSHEA Disclaimer is absent from the left-facing panel in the original packaging.
25  However, the new packaging sets out the DSHEA Disclaimer.

26  ///
27  ///
28  ///

1
2
3
4
5
6
7
8
9
10
11
12
13
14

# New Look

 

56.     Accordingly, each of the elements necessary for Plaintiff to succeed under California's catalyst theory have been met.  First, there is hardly a reasonable alternative explanation for Defendant's correction of its violative behavior which, based on information and belief, has persisted throughout the class period, other than Plaintiff's Complaint serving as that impetus.  Second, although Plaintiff's counsel is unaware of a jury verdict based on Plaintiff's theory of the case, at least one court has refused to dismiss such claims.  *See Arora v. GNC Holdings, Inc.*, No. 19-cv-02414-LB, 2019 WL 6050750, at *3 (N.D. Cal. Nov. 15, 2019).  Third, as discussed, Plaintiff genuinely attempted to arrive at a pre-suit resolution involving exactly the sort of packaging change that Defendant has made following Plaintiff's Complaint.

57.     Therefore, Plaintiff is entitled to an award of attorneys' fees because this action has resulted in the enforcement of an important right affecting the public interest: namely, (a) a significant benefit has been conferred on the general public or a large class of persons because it resulted in a change in defendant's labeling, (b) the necessity and financial burden of private enforcement is such as to make the award appropriate, and (c) such fees should not in the interest

of justice be paid of the recovery, if any.  Alternatively, to the extent any relevant labeling has not yet been changed as a result of this litigation, Plaintiff seeks injunctive relief to require such changes.

## **CLASS ACTION ALLEGATIONS**

58.    Class Definition: Plaintiff brings this class action on behalf of herself, and as a class action on behalf of the following putative classes (the "Class"):

**Nationwide Class**

All individual residents of the United States who purchased the Product through the date of class certification.  Excluded from the Class are: (1) Defendant and all directors, officers, employees, partners, principals, shareholders and agents of Defendant; (2) Any currently sitting United States District Court Judge or Justice, and the current spouse and all other persons within the third-degree of consanguinity to such judge/justice; and (3) Class Counsel.

**California Sub-Class**

All individual residents of the State of California who purchased the Product through the date of class certification.  Excluded from the Class are: (1) Defendant and all directors, officers, employees, partners, principals, shareholders and agents of Defendant; (2) Any currently sitting United States District Court Judge or Justice, and the current spouse and all other persons within the third-degree of consanguinity to such judge/justice; and (3) Class Counsel.

59.    Plaintiff reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified, including through the use of multi-state subclasses to account for variations in state law, if any.

60.    Numerosity and Ascertainability: Plaintiff does not know the exact number of members of the putative classes.  Due to Plaintiff's initial investigation, however, Plaintiff is informed and believes that the total number of Class members is at least in the tens of thousands, and that members of the Class are numerous and geographically dispersed throughout the United

States and California.  While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery, including Defendant's records, either manually or through computerized searches.

61.     <u>Typicality and Adequacy</u>: Plaintiff's claims are typical of those of the proposed Class, and Plaintiff will fairly and adequately represent and protect the interests of the proposed Class.  Plaintiff does not have any interests that are antagonistic to those of the proposed Class. Plaintiff has retained counsel competent and experienced in the prosecution of this type of litigation.

62.     <u>Commonality</u>: The questions of law and fact common to the Class members, some of which are set out below, predominate over any questions affecting only individual Class members:

    a.   whether Defendant committed the conduct alleged herein;

    b.   whether Defendant's conduct constitutes the violations of laws alleged herein;

    c.   whether Defendant's labeling, sale and advertising set herein are unlawful, untrue, or are misleading, or reasonably likely to deceive;

    d.   whether the Product are adulterated and/or misbranded under the California Health & Safety Code and identical federal law;

    e.   whether Defendant knew or should have known that the representations were false or misleading;

    f.   whether Defendant knowingly concealed or misrepresented material facts for the purpose of inducing consumers into spending money on the Product;

    g.   whether Defendant's representations, concealments and non-disclosures concerning the Product are likely to deceive the consumer;

    h.   whether Defendant's representations, concealments and non-disclosures concerning the Product violate the UCL and/or the common law;

    i.   whether Defendant should be permanently enjoined from making the claims at issue; and

    j.   whether Plaintiff and the Class are entitled to restitution and damages.

63.     <u>Predominance and Superiority</u>: Common questions, some of which are set out above, predominate over any questions affecting only individual Class members.  A class action is the superior method for the fair and just adjudication of this controversy.  The expense and burden of individual suits makes it impossible and impracticable for members of the proposed Class to prosecute their claims individually and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

64.     <u>Manageability</u>: The trial and litigation of Plaintiff's and the proposed Class' claims are manageable.  Defendant has acted and refused to act on grounds generally applicable to the Class, making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

65.     <u>Notice</u>: If necessary, notice of this action may be affected to the proposed Class through publication in a manner authorized in the California Rules of Court, Civil Code, and/or the Federal Rules of Civil Procedure.  Also, Class members may be notified of the pendency of this action by mail and/or email, through the distribution records of Defendant, third party retailers, and vendors.

**FIRST CAUSE OF ACTION**
**VIOLATION OF UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200, *et seq.*)**
**(Unlawful and Unfair Prongs of the Act)**

66.     Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

67.     Plaintiff brings this claim individually and on behalf of the proposed California Sub-Class against Defendant.

68.     California Business and Professions Code § 17200 prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  For

the reasons discussed above, Defendant has engaged in unlawful, unfair, and deceptive acts, and untrue and misleading advertising in violation of California Business & Professions Code §17200.

69.     As alleged herein, Plaintiff has standing to pursue this claim as Plaintiff has suffered injury in fact and has lost money or property as a result of Defendant's actions.   Specifically, Plaintiff purchased the Product for her own personal use.   In so doing, Plaintiff relied upon the representations referenced above.   Plaintiff would not have purchased the Product had she known that the Product was unlawful to sell in California and the United States.

70.     **Unlawful Business Practices:** Defendant's actions, as alleged herein, constitute illegal and unlawful practices committed in violation of the Business & Professions Code §17200.

71.     As alleged herein, Defendant has violated provisions of the FDCA, as amended by DSHEA, and implementing regulations, and in turn, the California Health & Safety Code, including, at least, the following sections: 21 C.F.R. § 101.93(b); 21 U.S.C. § 403(r)(6)(C); 21 U.S.C. § 343(r)(6); and 21 U.S.C. §§ 331, 333.

72.     As alleged herein, Defendant's conduct, including the above violations, violates the provisions of the California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 109875 et seq. (the "Sherman Law"), including, but not limited to, the following sections: § 110100; § 110395; § 110398; § 110400.

73.     In addition, Defendant has committed unlawful business practices by, *inter alia*, making the representations and omissions of material facts, as set forth more fully herein, and violating California Business & Professions Code § 17500, et seq., and the common law.

74.     In addition, Defendant has unlawfully manufactured, advertised, and disseminated false advertisements of the Product, and that the product advertising and packaging contain false or misleading statements about the Product in violation of Bus. & Prof. Code § 17500 which govern Defendant's conduct.

75.     Plaintiff and the California Sub-Class reserve the right to allege other violations of law which constitute other unlawful business acts or practices.   Such conduct is ongoing and continues to this date.

76.     **Unfair Business Practices**: California Business & Professions Code § 17200 also

prohibits any "unfair ... business act or practice."

77.     Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq*. in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

78.     There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

79.     Pursuant to section 17203 of the California Business & Professions Code, Plaintiff and the California Sub-Class seek an order of this court enjoining Defendant from continuing to engage in unlawful and unfair business practices and any other act prohibited by law, including, but not limited to: (a) selling, marketing, or advertising the Product with representations set forth above; (b) engaging in any of the illegal, misleading, unlawful and/or unfair conduct described herein; and (c) engaging in any other conduct found by the Court to be illegal, misleading, unlawful, and/or unfair conduct.

80.     In addition, Plaintiff requests that this Court enter such orders or judgments as may be necessary to restore to any person in interest any money which may have been acquired by means of such illegal practices as provided in Business & Professions Code § 17203, and for such other relief as set forth below.

81.     Plaintiff engaged counsel to prosecute this action and is entitled to recover costs and reasonable attorney's fees according to proof at trial.

## SECOND CAUSE OF ACTION
### UNJUST ENRICHMENT

76.     Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

77.     Plaintiff brings this claim individually and on behalf of the proposed Class against Defendant.

78.     As a result of Defendant's unlawful and misleading labeling, marketing, and sale of

the Product, Defendant was enriched at the expense of Plaintiff.

79.     Defendant sold Product to Plaintiff that was not capable of being sold legally and that was worthless.

80.     Plaintiff paid a premium price for the Product.

81.     Thus, it is against equity and good conscience to permit Defendant to retain the ill-gotten benefits received from Plaintiff and the Nationwide Subclass members given that the Product was not what Defendant purported it to be.

82.     It would be unjust and inequitable for Defendant to retain the benefit, warranting restitutionary disgorgement to Plaintiff and Class members of all monies paid for the Product, and/or all monies paid for which Plaintiff and the Class members did not receive benefit.

83.     As a direct and proximate result of Defendant's actions, Plaintiff and Class members have suffered damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and as representative of all other persons similarly situated, prays for judgment against Defendant, as follows:

1.     An order certifying that the action may be maintained as a Class Action under Fed. R. Civ. P. 23;

2.     An order permanently enjoining Defendant from pursuing the policies, acts, and practices complained of herein;

3.     An order requiring Defendant to pay restitution to Plaintiff and all members of the Class;

4.     An order requiring Defendant to pay damages to Plaintiff and all members of the Class;

5.     An order requiring Defendant to pay punitive damages to Plaintiff and all members of the Class;

6.     For pre-judgment interest from the date of filing this suit;

7.     For reasonable attorneys' fees, including fees pursuant to Cal. Civ. Code 1021.5;

8.     Injunctive relief,

1      9.      Costs of this suit; and,

2      10.     Such other and further relief as the Court may deem necessary and appropriate.

3                              **<u>DEMAND FOR JURY TRIAL</u>**

4      Plaintiff hereby demands a jury trial on all issues so triable.

5
Dated:  December 13, 2021                    Respectfully submitted,
6
                                             **BURSOR & FISHER, P.A.**
7

8                                            By:_____*/s/ L. Timothy Fisher*_____
9                                                     L. Timothy Fisher

10                                           L. Timothy Fisher (State Bar No. 191626)
                                             Joel D. Smith (State Bar No. 244902)
11                                           Sean L. Litteral (State Bar No. 331985)
                                             1990 North California Boulevard, Suite 940
12                                           Walnut Creek, CA  94596
                                             Telephone: (925) 300-4455
13                                           Facsimile:  (925) 407-2700
                                             E-Mail: ltfisher@bursor.com
14                                                   jsmtih@bursor.com
                                                     slitteral@bursor.com
15
                                             *Attorneys for Plaintiff*
16

17

18

19

20

21

22

23

24

25

26

27

28